CHARLES ALFRED ROGERS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rogers v. Commissioner
Docket No. 7537-76.
United States Tax Court
T.C. Memo 1980-171; 1980 Tax Ct. Memo LEXIS 417; 40 T.C.M. (CCH) 339; T.C.M. (RIA) 80171; May 12, 1980, Filed *417 Held, stipend received by petitioner during 1973 not excludable from gross income as a fellowship grant pursuant to section 117; held further, petitioner not entitled to a deduction for real estate taxes and rental losses in excess of the amount allowed by respondent. Harry N. Ray, for the petitioner. Dale L. Newland, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined a deficiency of $2,121.88 *418 in petitioner's 1973 Federal income tax. The issues for decision are: 1. Whether certain amounts received by petitioner during 1973 are excludable from gross income as a scholarship or fellowship grant pursuant to the provisions of section 117.[1]
2. Whether petitioner is entitled to a deduction in 1973 for real estate taxes and rental losses in excess of the amount allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner Charles Alfred Rogers resided at Marshfield, Wisconsin, when he timely filed his 1973 Federal income tax return with the Director of Internal Revenue in Ogden, Utah, and when he filed his petition in this case. At the time of trial, petitioner resided in Minneapolis, Minnesota. Petitioner graduated from the University of Kansas Medical School in June 1970 with a doctorate in medicine. From his graduation until June 1971, petitioner served as an intern at the University of Minnesota Hospitals, Minneapolis, Minnesota (hereinafter University Hospitals). In June 1971, petitioner began a pediatrics residency *419 at the University Hospitals. On July 1, 1972, he was appointed to the house staff of the Department of Pediatrics at the University Hospitals for a period ending on June 30, 1973. In order for a physician to participate in the residency program in the Department of Pediatrics at the University Hospitals, generally an individual must enroll in the University's graduate school as a degree candidate. In August 1973, petitioner discovered that he had not been enrolled in the Ph.D. program in the Department of Pediatrics. At the time, he applied for permission to enroll in that program. Petitioner, however, never completed the program, nor did he prepare a thesis. The University's advanced degree program has combined a traditional residency program, whereby physicians obtain the training and experience necessary to become certified in a medical specialty, with an academic program involving research and writing. Thus, residents (or "medical fellows") perform clinical activities in a hospital setting as well as satisfy academic requirements prior to receiving advanced degrees. There are no written contracts governing the respective obligations and duties of the residences or the *420 hospitals to which they are assigned. It is generally understood, however, that the residences are required to fulfill their duties and assignments in the care of patients, observe hospital rules and act in a responsible manner. Moreover, the "Bylaws of the Medical and Dental Staff" at the University state that residents are considered members of the medical staff. Another University publication entitled "Handbook of Patient Rights and Responsibilities" explains the respective roles of the attending physician and the resident as follows: The Attending Physician is the doctor who is responsible for your treatment plan. Although you may not see him each day, he supervises your care by working with the residents, interns and nursing staff. The Resident who you will meet is a graduate of medical school who usually has been working with patients in clinics or a hospital for several years. He is responsible for seeing that your medications, examinations, and treatments are scheduled property and that you are being given the best care possible. You will be seeing him at least once a day. It would help for you to know who he is so that you can ask him any question you may *421 have about your hospital stay. During the period between January 1, 1973 and June 30, 1973, petitioner's participation in the general residency program involved rotating through various pediatric and intensive care wards and caring for a wide variety of children with various pediatric illnesses.Petitioner performed the following patient services: Ordered prescriptions; wrote treatment orders for patient care; took patients' physical and medical histories; ordered special reports (consultations, X-rays, 1ab tests); assessed and diagnosed patients (subject to review by attending physicians); reviewed intern or medical student diagnoses; secured autopsy consents; prepared progress notes; prepared case summaries; prepared discharge notes; signed death certificates; commenced the administration of intravenous fluids; inserted nasal gastric tubes; and worked in emergency room. In January and February of 1973, petitioner spent from eight to ten hours each day he was on duty at the University Hospitals. He was on call every third and fourth weekend during these months. In March and April of 1973, petitioner spent eight to ten hours each day he was on duty in the Pediatric Intensive *422 Care Unit at the University Hospitals and was required to be on call every other day during this rotation. In May and June of 1973, petitioner spent eight to ten hours each day he was on duty in a hematology-oncology rotation and was required to be on call on weekends when needed. While on call, the residents are responsible for responding to emergencies which develop in a patient's condition. When a resident is called to the hospital while "on call," the normal procedure is to analyze the situation and discuss it with the chief resident, who in turn decides whether the situation warrants consultation with the staff doctor. Between July 1, 1973 and December 31, 1973, petitioner participated in the post-residency trainership program which involved performance of lab work leading to the diagnosis and treatment of pediatric patients at the University Hospitals; consultation with interns, residents, and staff on the course of treatment for the Hospital's pediatric patients; and research on particular patient's problems. Any patentable research done by the residents was retained by either the University or the Federal government (with respect to funds provided by the United States *423 Public Health Service). During this period petitioner spent eight to ten hours each day he was on duty in Pediatric Gastroenterology and three hours a day on Saturdays and Sundays as needed. In addition to performing clinical activities in a hospital setting, residents are expected to perform teaching duties. A pediatrics resident is expected to carry on the instruction of medical students, nurses, paramedical personnel and patients. Once a resident is a candidate for an advanced degree within a department, the individual receives an amount of money, which the University refers to as a "stipend." The resident enters the program at the "G-1 level" and all residents at this level receive a uniform stipend. There are various levels and the stipend for each level increases each year, not only as the result of cost-of-living increases, but in recognition of advancing within the program. A G-2 level resident, for example, receives more than a G-1 level resident but less than a G-3 level resident. The amount of the stipend is set by a committee of department heads at the University which has attempted to keep such amount in line with amounts paid to residents in other programs in *424 the Midwest. In setting the amount of the stipend, individual need is not considered. Therefore, whether a resident is married or has children or whether a spouse is gainfully employed is not considered by the committee. Between January 1, 1973 and June 30, 1973, petitioner received a stipend in the amount of $5,291 from the University. On July 1, 1973, the source of the funding of petitioner's stipend changed to a grant by the United States Public Health Service to the University. Thus, between July 1, 1973 and December 31, 1973, petitioner received $4,821 from that grant to the University. In addition, he received $950 from the University's Department of Pediatrics. During 1973, petitioner also received substantial fringe benefits as a resident.He could purchase health insurance at student rates and was included as an insured in the University Hospitals' malpractice insurance policy. He was allowed sick leave and two weeks of vacation. Lab costs, laundry service and free meals while on call were furnished by the University Hospitals.
In the notice of deficiency, respondent determined that the lamounts totaling $11,062 petitioner received as a stipend in 1973 were not *425 excludable from his gross income. Respondent claims such amounts represented compensation for past, present, or future employment services; represented payment for services which are subject to the direction and supervision of the University; or the studies and research pursued by petitioner were primarily for the benefit of the University. Respondent further disallowed $827.86 of the amount petitioner deducted for real estate taxes and rental losses on his 1973 return. OPINION We must determine (1) whether certain amounts received by petitioner during 1973 are excludable from gross income as a scholarship or fellowship grant pursuant to the provisions of section 117; (2) whether petitioner is entitled to a deduction in 1973 for real estate taxes and rental losses in excess of the amount allowed by respondent.
Issue 1
During 1973 petitioner received $5,291 from the University of Minnesota, $4,821 from a grant to the University of Minnesota by the United States Public Health Service, and $950 from the University of Minnesota Medical School, Department of Pediatrics. He excluded these amounts from gross income claiming they constituted a stipend which was nontaxable as a *426 fellowship grant. Respondent argues that the amounts petitioner received while a resident and trainee at the University of Minnesota Hospitals represented compensation for services and did not constitute fellowship or scholarship income excludable under section 117. For reasons set forth below, we agree with respondent. Section 117(a) excludes from gross income stipends which qualify as scholarship or fellowship grants. Section 117(b)(1) provides that in the case of degree candidates, the exclusion from gross income does not apply to payments for teaching, research or other services in the nature of part-time employment required as a condition to receiving the scholarship or fellowship grant. An exception is carved out of the rule in section 117(b)(1) where the teaching, research or other services are required of all degree candidates. Section 1.117-4(c), Income Tax Regs., provides that payments as "compensation for past, present, or future employment services" and payments made to "an individual to enable him to pursue studies or research primarily for the benefit of the grantor" are not excludable as scholarship or fellowship grants. The Supreme Court upheld these regulations *427 in Bingler v. Johnson,394 U.S. 741 (1969). We are unable to find that the stipend at issue constituted a fellowship grant qualified for the section 117 exclusion. Petitioner did not testify, presented no witnesses at the trial, and failed to submit briefs stating his case. His petition merely stated that "[the] commissioner erred in disallowing as a deduction the stipend." Generally determinations in a notice of deficiency are presumed correct. The burden of proving such determinations wrong is on the taxpayer. Welch v. Helvering,290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure. On the basis of this record, we find that petitioner has failed to carry his burden and must hold for respondent. We conclude that petitioner is not entitled to exclude from his gross income the stipend he received in 1973. Issue 2
Petitioner deducted an amount on his 1973 return for real estate taxes and rental losses. Respondent disallowed $827.86 of the amount deducted. Again, petitioner failed to allege in his petition, to present evidence at trial, or to submit briefs, stating the basis upon which he believed respondent *428 erred. Since petitioner failed to carry his burden of proof, we must uphold respondent's determination. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended.↩